It is rare to have disinterested expert witnesses with such outstanding credentials and comparable access to the pertinent facts offer credible testimony with diametrically opposite conclusions. The key premise for both positions is the plaintiff's well documented history of absorbing lead while occupationally exposed during approximately eight years of employment with the defendant, quantified by periodic tests. (The most complete list of test results are the handwritten notes of Dr. Mason, the last exhibit to his deposition, Defendant's Exhibit 13-A.) For example, Dr. Parkinson, a physician trained at Oxford and Harvard who was involved with the ground-breaking studies on lead exposure in children, had seen some 500 adult patients in connection with his work as Chief Medical Consultant for the United Steel Workers of America since 1978, and treating physician for employees of the Exide Battery Company under an agreement with that firm and its union. The sense of his deposition is not merely that plaintiff's severe problems were an infrequent or unlikely result of his level of exposure, but that the physical mechanism for cause and effect did not exist. He acknowledges that the constellation of symptoms which plaintiff suffers is consistent with lead poisoning (except for a "low grade fever" — "I've never seen that one"), but he associates them with much higher levels of exposure, would not anticipate that the symptoms would last so long following exposure, and points out that the symptoms are of a "general" nature that could be caused by many things, notably including serious viral infections. In sharp contrast, Dr. Mason, former Chief Toxicologist in the North Carolina Medical Examiner's Office, felt the pattern of exposure and the coincidence of symptoms clearly pointed to a cause and effect relationship. Approaching the question through the science that studies the "relationship between the introduction of [a] poison and the production of a particular kind of effect", his testimony tended to validate the opinions of the doctors who had reached the same conclusion largely by eliminating other possible causes. He felt that the damage was done in one or more acute episodes of high lead absorption, particularly harm to the nervous system, so that the plaintiff continued to suffer even while the amount of lead in his body decreased. While he had personally studied perhaps only a half dozen lead poisoning cases, the study of the nature and effect of a broad range of toxic substances — his current employer, National Medical Services, Inc., can analyze over 8500 separate agents — brings a dimension of understanding to the problem that physicians are unlikely to share. The poisonous properties of lead had been studied in his field since the 19th century and was literally a textbook example. Lead poisoning was included in the initial list of occupational diseases when our occupational disease statutes were enacted in 1935. N.C. Gen. Stat. § 97-53 (6). He testified directly that, "I have seen reports in the literature of adverse effects from levels" of lead in the body comparable to and lower than that of the plaintiff. Depo. of Dr. Mason, p. 84.
Finally, logic favors the plaintiff. While we should guard against confusing correlation with cause, the circumstantial and temporal relationship of exposure and onset, particularly when other causes are excluded, can be highly probative in occupational disease cases. Booker v. Duke University Medical Center, 297 N.C. 458,476, 256 S.E.2d 189 (1979). Evidence that plaintiff may have been medically unusual — such as his hospitalization for lethargy when in his 20's and a family history that included a rare blood disease — tends to confirm the suggestion in the experts' opinions that he was unusually susceptible to damage from relatively low levels of absorbed lead. "[W]here a workman by reason of constitutional infirmities is predisposed to sustain injuries while engaged in labor, nevertheless the leniency and humanity of the law permit him to recover compensation if the physical aspects of the employment contributed in some reasonable degree to bring about or intensify the condition which renders him susceptible to such accident and consequent injury." Vause v.Vause Equipment Co., 233 N.C. 88, 92, 63 S.E.2d 173 (1951).
In disposition of defendants' motion, we believe that Dr. Grote, plaintiff's treating physician, is in the best position to refer him for treatment by a lead poisoning specialist, with the benefit of the resources defendants will bring to bear as a result of this decision.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or substantively amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties stipulated that plaintiff's average weekly wage, at all relevant times, was $563.96, yielding a compensation rate of $375.97 per week.
2. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. The parties stipulated that at the relevant time there existed an employment relationship between plaintiff and defendant-employer.
4. It is stipulated that at all relevant times Aetna Casualty Surety Company was the carrier on the risk for defendant-employer.
5. 458 pages of medical reports, collectively marked as Stipulated Exhibit #1, have been admitted as part of the record in this matter.
* * * * * * * * * * * * *
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following
FINDINGS OF FACT
1. The plaintiff, who is now 43 years of age, began working for defendant-employer on September 19, 1983. The last day plaintiff worked for defendant-employer was February 4, 1992.
2. Plaintiff worked in the pasting section of defendant-employer's battery plant in Winston-Salem, North Carolina. He was employed as a plate take-off attendant, as well as a machine operator.
3. In the pasting section, lead oxide dust was fed into a mixer, where it was mixed with water, sulfuric acid, and binding agents. The lead oxide paste was then applied to lead grids. The pasted grid was dried in a conveyor oven and then stacked prior to being placed into a curing oven.
4. As a plate take-off attendant, plaintiff was responsible for the inspection, transfer, and stacking of the plates. As a machine operator, plaintiff was responsible for pasting inspected grids.
5. On the date plaintiff was hired by defendant-employer, he underwent a blood sampling test for the purpose of determining his blood lead concentration. Plaintiff had a blood level of one microgram of lead per 100 milliliters of blood. Subsequently, plaintiff was tested periodically, and his blood consistently reflected elevated levels of lead.
6. Plaintiff began to experience persistent headaches, nausea, vomiting, and photophobia. On August 1, 1991, plaintiff's family doctor, Dr. Walter H. Wray, Jr., referred plaintiff to Dr. Edward G. Hill, Jr., a neurologist. Dr. Hill first examined plaintiff on August 2, 1991.
7. Dr. Hill admitted plaintiff to Forsyth Memorial Hospital on August 3, 1991, for evaluation and treatment, where he remained for one week. At the time of plaintiff's admission to the hospital, he was lethargic and his headaches were worsening. A series of tests, including a spinal tap, were performed. Plaintiff did not have meningitis or Lyme disease. At first, it was thought that plaintiff had a viral syndrome. Plaintiff remained out of work for several weeks.
8. While plaintiff was in the hospital, he was evaluated by Dr. Richard S. Marx, a specialist in infectious diseases and internal medicine. Plaintiff's symptoms were consistent with lead toxicity.
9. On September 13, 1991, plaintiff was taken to the emergency room of Forsyth Memorial Hospital because of severe headaches, as well as pain in his left arm and left foot. The plaintiff was readmitted to the hospital by Dr. J. Christine Dean, who noted an initial impression of "chronic lead exposure." Further tests were performed, and plaintiff was discharged from the hospital on September 20, 1991.
10. Plaintiff was referred by Dr. Hill to Dr. Thomas H. Grote, a specialist in hematology. Dr. Grote began to treat plaintiff on October 11, 1991 and released plaintiff to return to work on November 4, 1991.
11. Plaintiff's condition began to deteriorate. Plaintiff continued to experience headaches, fatigue, and weight loss. The plaintiff was removed from work again.
12. Plaintiff was next referred to Dr. Paul R. Eason of the Bowman Gray School of Medicine. As a result of plaintiff's employment with defendant-employer, plaintiff sustained lead poisoning.
13. In October of 1992, plaintiff was treated with chelation therapy, a process that removes lead from the body. However, plaintiff failed to excrete sufficient levels of lead to warrant further use of this procedure.
14. Defendant-carrier sought further medical evaluation of plaintiff. Plaintiff was next examined by Dr. David A. Compton, who also reviewed the plaintiff's medical records in light of his work experience. As a result of plaintiff's exposure to lead in defendant-employer's plant, he had nausea and vomiting, headaches, abdominal pain, lightheadedness, an erratic sleep pattern, and a diminished memory and cognitive capability.
15. Plaintiff's medical records have also been reviewed by Dr. Andrew P. Mason, Ph.D., Dr. Eugene Shippen and Dr. David K. Parkinson.
16. There is no evidence that plaintiff has been injuriously exposed to lead other than when he was exposed to it at defendant-employer's battery plant. Plaintiff was last injuriously exposed to the hazards of lead poisoning in his employment with defendant-employer.
17. As a result of plaintiff's exposure to lead in defendant-employer's plant, he has had significant losses with regard to intellectual capacity, cognitive capability, and memory.
18. Plaintiff's last blood sample taken on February 4, 1992, his last day of work with defendant-employer, revealed a blood lead level of 65. If an employee registers a blood level reading in excess of 50, he must be removed from the work area until he registers two consecutive readings under 40.
19. At the time of the hearing before the Deputy Commissioner, plaintiff's blood lead level had fallen considerably; however, he still experienced no significant improvement in his symptoms.
20. Plaintiff has been paid $375.97 per week by defendant-carrier since his last day of employment on February 4, 1992.
21. As a result of his exposure to lead in defendant-employer's battery plant, plaintiff also experiences hypertension.
22. Plaintiff was exposed to the hazards of lead poisoning in defendant-employer's battery plant for at least thirty days in the preceding twelve months, prior to his last day of employment.
23. As a result of plaintiff's exposure to lead in defendant-employer's plant and resulting symptoms, he is and remains incapable of earning wages with defendant-employer, or in any other employment.
* * * * * * * * * * * *
The foregoing findings of fact and conclusions of law engender the following
CONCLUSIONS OF LAW
1. By February 4, 1992, plaintiff was exposed to the hazard of lead poisoning for at least 30 days in the preceding twelve month period, during which time, plaintiff was last injuriously exposed in his employment with defendant-employer, which resulted in plaintiff's contraction of lead poisoning, an enumerated occupational disease. G.S. § 97-53 (6).
2. As a result of plaintiff's occupational disease, he is and remains temporarily totally disabled and is entitled to $375.97 per week from November 4, 1992, and continuing until further Order of the Industrial Commission. G.S. § 97-29.
3. Plaintiff is entitled to payment of all medical expenses, including treatment for hypertension, incurred by the plaintiff as a result of his occupational disease. G.S. § 97-25.
* * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff, on account of his occupational disease, temporary total disability compensation at the rate of $375.97 per week beginning February 4, 1992, and continuing until further Order of the Industrial Commission. Amounts of temporary total disability compensation which have accrued, if any, shall be paid to plaintiff in a lump sum, subject to an attorney fee provided below.
2. Defendants shall pay all medical expenses incurred, or to be incurred, as a result of plaintiff's occupational disease when approved in accordance with the rules of the Industrial Commission.
3. A reasonable attorney fee in the amount of twenty-five percent of the compensation benefits due under Paragraph 1 of this AWARD is approved. Of the accrued amount, if any, paid in a lump sum to plaintiff, defendants shall deduct twenty-five percent and forward that amount directly to plaintiff's counsel. For the balance of the attorney fee, defendants shall forward every fourth compensation check directly to plaintiff's counsel.
4. Defendants shall pay the costs due this Commission.
IT IS FURTHER ORDERED that plaintiff be re-evaluated, and treated if appropriate, by a physician with expertise in dealing with lead poisoning selected by Dr. Grote.
 S/ _________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _________________________ LAURA K. MAVRETIC COMMISSIONER
S/ _________________________ BERNADINE S. BALLANCE COMMISSIONER
JRW:md